01-2026 PAM/RLE

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 03-2189

| | | |
|---|---|---|
| Herman Jackson, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Minnesota. |
| Flint Ink North American Corporation, | * | |
| also known as Flint Ink Corporation, | * | |
| | * | |
| Appellee. | * | |

Submitted: February 13, 2004

Filed: June 7, 2004 (Corrected July 7, 2004)

Before MORRIS SHEPPARD ARNOLD, JOHN R. GIBSON, and RILEY, Circuit Judges.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

During the seventeen months that Herman Jackson worked as a paste operator at Flint Ink North American Corporation, he was disciplined twenty times for violating Flint Ink's work rules and attendance policy. Flint Ink terminated his employment on three separate occasions, but agreed with Mr. Jackson's union to reinstate him after the first two terminations. After he was fired the third time, he filed suit, alleging, as relevant here, that Flint Ink had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, by subjecting him to a hostile

SCANNED
SEP 13 2004
U.S. DISTRICT COURT MPLS

work environment because of his race (he is black), and by retaliating against him for reporting the racially hostile work environment to a superior. The district court[1] granted Flint Ink's motion for summary judgment on both claims.

Mr. Jackson maintains that the district court improperly granted summary judgment with respect to his hostile work environment and retaliation claims. "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000); *see* Fed. R. Civ. P. 56(c). Reviewing the district court's grant of summary judgment *de novo*, *see Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999), we affirm.

I.

To prevail on his hostile work environment claim, Mr. Jackson must show that he was a member of a protected group, that he was subjected to unwelcome harassment, that the harassment was because of his membership in the group, and that the harassment affected a term, condition, or privilege of his employment. *See Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000). Unless the alleged harassment was caused by his supervisors, Mr. Jackson must also show that Flint Ink knew or should have known about the harassment but failed to take prompt and effective remedial action. *See id.* at 566 & n.5.

In order to be actionable under Title VII, a work environment must have been "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). We assume for present purposes

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

that Mr. Jackson thought that his work environment was offensive. We must decide, though, whether a reasonable person would have perceived the environment to be hostile or abusive. In making this inquiry, we look "at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Only actions that are "so severe or pervasive as to alter the conditions of [the plaintiff's] employment" can create an actionable environment. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (per curiam) (internal quotations omitted).

Mr. Jackson has presented evidence of several incidents that occurred during his employment at Flint Ink that can plausibly be characterized as racial harassment, including the use of racial epithets by his managers and co-workers and the appearance of racially derogatory graffiti.

Mr. Jackson alleges that he heard managers refer to him using racially derogatory terms on two occasions. He testified in his deposition that he heard his supervisor, Larry Stordahl, refer to him as "that damn nigger" after an altercation during which Mr. Jackson threatened two co-workers after one of them spit on his foot or somewhere in his work area. Mr. Jackson also testified that on one occasion as he was leaving the office of Frank Schreiner, the plant manager, he heard Mr. Schreiner use the term "black" or "damn black" in some unspecified context.

In addition to these two incidents, Mr. Jackson testified to four instances in which his co-workers had made racially offensive remarks: One co-worker used the slang phrase "nigger-rigging" when several workers were sitting at a picnic table, which Mr. Jackson describes as "an old saying that when we working on stuff and it's old stuff, you know, we call it nigger-rigging." Another co-worker called Mr. Jackson a "nigger." A third co-worker, on one occasion, expressed his dislike for

music that Mr. Jackson was listening to by stating that "[w]e don't listen to that damn black music around here, nigger shit, radio." The same co-worker, during the incident in which Mr. Jackson was concededly "in [the] face" of another co-worker who had spit in his work area, pulled the other co-worker away and exclaimed "fucking nigger."

Finally, Mr. Jackson testified that "KKK sign" graffiti appeared in both the shower area and on a wall near the back door in the chemical area at Flint Ink. He offered pictures of these graffiti into evidence, each showing a drawing of a burning cross surrounded by three "K"'s. Mr. Jackson testified, regarding the graffiti on the back wall, that "they got it like it's burning and it seemed like they want to put me on a cross and burn me up. I'm from Mississippi, you know, and all this stuff is scary, you know, it's very scary." Another black Flint Ink employee, Ronnie Davis, testified that he saw the graffiti on the back wall and thought that it was a threat against Mr. Jackson "[b]ecause they didn't like the guy. They just didn't like the guy."

The words "H.J. slept here" were written on a molding piece or wooden frame that was perpendicular to the back wall at Flint Ink on which the KKK symbol was found. The initials apparently refer to Mr. Jackson, who had been disciplined twice for sleeping in the break room and in his truck during work hours. (Similar comments about the discovery of Mr. Jackson sleeping on the job were found written in other locations at Flint Ink.) Mr. Jackson initially stated in his deposition that his name was "under" the cross in his work area, but he later qualified this by agreeing that the name was "actually on the molding piece, it's not on the same portion of what the KKK is."

The dissent notes that, in testifying regarding the KKK symbol in the shower area, Mr. Jackson stated that "they got the KKK sign plus the burning cross, and then they got my name on it." But that quotation is isolated from its context. When pressed, Mr. Jackson said merely that there was other graffiti somewhere in the

vicinity of the KKK symbol in the shower area that he was unable to read. Mr. Jackson testified that he did not know what this writing said, but that one of his attorneys "read it off what it said, and I wasn't seeing how he could do it," and told him that it said "Herman something." During his deposition, Mr. Jackson was shown a picture that he had taken of the KKK symbol and the shower area surrounding it and was asked to indicate where in the picture the graffiti that purportedly included his first name was located. He initially stated that he did not "see it on the document," then contended that his name "was on there or under there somewhere," and eventually pointed somewhere on the document. The record does not indicate where he was pointing. The record does contain the picture submitted by Mr. Jackson of what is evidently the wall in question, but the word "Herman" is nowhere discernible in it.

"[C]onduct must be extreme to amount to a change in the terms and conditions of employment," *Faragher*, 524 U.S. at 788, but the "[h]arassment need not be so extreme that it produces tangible effects on job performance or psychological well-being." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999). Whether the existence of racially derogatory behavior in the workplace constitutes a hostile work environment actionable under Title VII is a function of both the severity and pervasiveness of the offensive conduct, with a high level of severity compensating for a low level of pervasiveness and vice versa.

The result in several of our previous cases involving racial slurs and harassment in the workplace has turned upon the pervasiveness *vel non* of the offensive conduct. "Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII." *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981). But "[o]ffhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment." *Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003).

Thus, in *Johnson*, we concluded as a matter of law that there was no violation of Title VII because there was "no steady barrage of opprobrious racial comment" and the "use, if any, of racial terms was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward" the plaintiffs. *Johnson*, 646 F.2d at 1257. We explained that "[m]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions." *Id.* (internal quotations omitted). Similarly, in *Powell v. Missouri State Highway and Transp. Dep't*, 822 F.2d 798, 801 (8th Cir. 1987), we upheld a trial court's finding that there was not a racially bigoted work environment where there was evidence that a plaintiff had been subjected to "a few isolated racial slurs." In contrast, we upheld a finding of an objectively hostile work environment resulting in a constructive discharge in *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 352, 354 (8th Cir. 1997), where there was testimony that the plaintiff had been subjected to "a steady barrage of racial name-calling at the [defendant's] facility," and we upheld a finding of a hostile work environment in *Ways v. City of Lincoln*, 871 F.2d 750, 754-55 (8th Cir. 1989), where the plaintiff had identified about fifty examples of racial harassment.

Here, there is evidence that Mr. Jackson was exposed, at most, to six isolated instances of racially derogatory language from two managers and three co-workers over the course of a year and a half. Mr. Jackson does not contend that either of the alleged derogatory statements made by managers were made to him. One of these ("that damn nigger") was made in the context of breaking up the emotional confrontation involving spitting and threats. Mr. Jackson testified that he did not understand the other statement ("black" or "damn black") at the time and that he could not remember it well. The four alleged racial statements made by co-workers were highly offensive, but two of these ("nigger shit, radio" and "nigger-rigging") were not referring directly to Mr. Jackson, and another ("fucking nigger") was made in the heat

of the spitting episode, during which it is uncontradicted that Mr. Jackson had threatened to "kick both of [his co-workers'] asses" and to "kill" one of them.

The offensive racial slurs in the record were infrequent and few in number, and some of them appear to have been offhand remarks not directed specifically at Mr. Jackson; there is no evidence of a "steady barrage of opprobrious racial comment." Standing alone, we think that the derogatory language identified by Mr. Jackson would not violate Title VII, which does not "impose a code of workplace civility." *See Palesch*, 233 F.3d at 567.

The burning cross graffiti, however, makes this a closer case, as its symbolism is potentially more hostile and intimidating than the racial slurs. Even a single instance of workplace graffiti, if sufficiently severe, can go a long way toward making out a Title VII claim. Two of our recent cases provide guidance as to the proper significance to be given the graffiti in assessing Mr. Jackson's claim. Each case is factually similar to the instant case in that the plaintiffs were trying to make out a hostile work environment claim based on evidence that a small number of racial epithets had been uttered in the workplace and racist graffiti had appeared in the bathroom. In *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002), "racist graffiti – drawings of 'KKK,' a swastika, and a hooded figure – appeared on the walls of one of the men's restrooms at the plant" and copies of a racially derogatory "poem" were "strewn about the plant." We held that these alleged incidents of racial harassment by co-workers, which we deemed "inexcusable behavior," were "neither severe nor pervasive enough to create a hostile work environment." *Id.* (internal quotations omitted).

On the other hand, in *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 908-10 (8th Cir. 2003), we held that a hostile work environment claim was submissible where racial graffiti that included the plaintiff's name written below the phrase "kill all niggers," the word "coon" written below the plaintiff's name, and a

drawing of an ape accompanied by the phrase "all niggers must die" had appeared in a bathroom stall. We distinguished *Woodland* by characterizing the symbols in the graffiti there as being "generically threatening" as opposed to the "death threat aimed directly and specifically at [the plaintiff in *Reedy*]," the severity of which we found to be the dispositive consideration. *Id.* at 909. Thus, we determined that it was particularly significant that the "message of hate expressed to [the plaintiff in *Reedy*] through the graffiti was physically threatening in a way that the graffiti in *Woodland* was not." *Id.*

We think that the burning cross graffiti here falls somewhere in between what was involved in *Woodland* and *Reedy* in terms of its severity. The Supreme Court has recognized that "the burning of a cross is a 'symbol of hate,' " *Virginia v. Black*, 123 S. Ct. 1536, 1546 (2003) (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 771 (1995) (Thomas, J., concurring)), and that "when a cross burning is used to intimidate, few if any messages are more powerful," *id.* at 1547.

A crude drawing of a burning cross scrawled on the wall is, however, objectively less intimidating than a real live burning cross, and is, we think, closer in nature to the "KKK," swastika, and hooded figure symbols on the bathroom wall in *Woodland* than the "kill all niggers" graffiti associated with the plaintiff in *Reedy*. The burning cross undoubtedly evokes the Ku Klux Klan and its racialist ideology and frequently violent history. But we are unable to conclude from the evidence in the record that the crosses were "death threat[s] aimed directly and specifically" at Mr. Jackson as opposed to generically threatening expressions of sympathy with the beliefs of the Ku Klux Klan. While Mr. Jackson testified that graffiti stating "H.J. slept here" and some other indecipherable message including the word "Herman" were situated somewhere in the vicinity of the burning crosses, and non-racial graffiti referring to Mr. Jackson was also found in other areas of Flint Ink, the record will not support an inference that the pictures of the burning crosses and any references to Mr. Jackson were intended to be read together as threatening comments directed

specifically at Mr. Jackson. Even assuming *arguendo* that some connection between the crosses and references to Mr. Jackson can be reasonably inferred, the resultant communications are more vague and ambiguous than those at issue in *Reedy*, which we characterized as "a close case" in terms of making out a submissible claim based on a hostile work environment, 333 F.3d at 909.

After careful consideration, we conclude that the graffiti and the episodic racial slurs involved in this case were insufficient to make out a Title VII claim. Mr. Jackson has failed to present sufficient evidence that the harassment at Flint Ink was so severe or pervasive that it altered the terms or conditions of his employment.

The district court did not reach the issue of whether Mr. Jackson made the required showing that Flint Ink knew or should have known about the alleged harassment by non-supervisors but failed to take prompt and effective remedial action. It is unnecessary for us to address this issue in detail, but the evidence in the record does not indicate that managers at Flint Ink were aware of the burning cross graffiti or the co-workers' racially derogatory statements. (There is evidence that the management became aware of other graffiti at Flint Ink, which they promptly had removed.) As the district court found, though, Mr. Jackson did report the alleged racism of his supervisor, Mr. Stordahl, to Mr. Stordahl himself. This report is at issue in his retaliation claim discussed below.

II.

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Mr. Jackson contends that he was unlawfully retaliated against because he was fired for complaining to his supervisor, Mr. Stordahl, about Mr. Stordahl's own racism. A plaintiff asserting a Title VII

retaliation claim must first establish a prima facie case of retaliation by showing that he or she engaged in a protected activity, that an adverse employment action occurred, and that there is a causal connection between the two events. *See Sherpell v. Humnoke Sch. Dist. No. 5*, 874 F.2d 536, 540 (8th Cir. 1989). If a plaintiff makes such a showing, the burden of production then shifts to the defendant to rebut the plaintiff's prima facie case under the principles set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Mitchell v. Iowa Prot. & Advocacy Servs.*, 325 F.3d 1011, 1013 (8th Cir. 2003).

The district court held that Mr. Jackson had failed to make out a prima facie case of retaliation: It concluded that he established facts sufficient to prove that he had engaged in a protected activity (complaining to Mr. Stordahl about Mr. Stordahl's own racially discriminatory behavior) and that an adverse employment action had occurred (he was terminated), but that he had failed to establish a causal connection between the protected conduct and the adverse action.

Mr. Jackson maintains that, contrary to the district court's conclusion, he has produced sufficient evidence that he was fired because he complained about racial discrimination. He relies, for the most part, on the temporal proximity of the two events, alleging that he complained about the discrimination about a month before his third and final termination from Flint Ink. In his charge of discrimination to the Minnesota Department of Human Rights, he stated that the last time that he had complained about the discrimination was four months before he was fired. Though the evidence in the record is unclear and inconsistent regarding when, if ever, he actually complained, we give him the benefit of the doubt for summary judgment purposes and assume that he complained a month before he was fired.

Mr. Jackson was disciplined twenty times during his seventeen months at Flint Ink, eventually resulting in his final termination. Many of his infractions related to his attendance and use of the time clock, e.g., failing to punch out, punching in too

early or late, punching in and then failing to work, and missing work for various reasons. He was also disciplined for "loafing," sleeping on the job, refusing to follow orders from his supervisor, and taking extended breaks.

Mr. Jackson grieved his third firing, and he was represented by his union in an arbitration hearing. The arbitrator's findings, while by no means binding on a jury, provide persuasive evidence in the form of a neutral party's observations regarding Mr. Jackson's work performance and the appropriateness of Flint Ink's disciplinary responses. The arbitrator, after conducting an evidentiary hearing, concluded that Flint Ink's disciplinary actions were "*totally* consistent with the explicit principle of Progressive Discipline," and that "the frequency and consistency of [Mr. Jackson's] inappropriate behavior must be clearly characterized as 'abuse of time' and that pattern of behavior constituted an incontrovertible disregard for the understood and reasonable expectations of the Employer relative to his compliance with plant-wide Rules, *and* such must be characterized as sufficient cause for discharge." Regarding Mr. Jackson's claims of discrimination, the arbitrator stated that the record was "*totally* devoid of *any* evidence that would/could buttress a finding [that Mr. Jackson] was discharged for *any* reason other than his demonstrated abuse of time/attendance behavior," and that Flint Ink "has clearly communicated its expectations relative to compliance with work hour rules to all employees, *and* has consistently applied discipline to those who elected to violate such."

There is abundant evidence in the record that Mr. Jackson consistently failed to meet the legitimate expectations of Flint Ink in the performance of his job. Mr. Jackson contends that the long string of disciplinary actions, culminating in his final termination, was due to his supervisors' racism. He argues that these documented violations and warnings do not amount to evidence that he was not meeting the legitimate expectations of Flint Ink, but instead are "at best, irrelevant" to Flint Ink's decision to fire him because they are all "after-the-fact rationalizations for having terminated Mr. Jackson and demonstrate the extent of Flint Ink's

retaliation." Based on our independent reading of the record, we agree with the district court that Mr. Jackson has "offer[ed] no evidence aside from bald speculation to support his argument that the warnings he received were illegitimate." There is no evidence that his disciplinary record was somehow contrived or that being fired as a result of amassing such a record would be in any way out of the ordinary. Indeed, the evidence showed that several other employees, both white and black, had been terminated for similar violations of plant rules and the attendance policy.

We have noted that "a plaintiff can establish a causal connection between statutorily protected activity and an adverse employment action through circumstantial evidence, such as the timing between the two events." *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998). While timing alone may sometimes be sufficient to establish a causal connection for the purpose of making a prima facie showing of retaliation, it is insufficient where, as here, other evidence overwhelmingly suggests another legitimate reason for the adverse employment action. "Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies [and] unsatisfactory performance." *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir. 1988), *cert. denied*, 488 U.S. 892 (1988). Thus, "[w]e will not hold an employer legally liable for firing an employee who is not performing his job satisfactorily merely because the discharge follows within" a relatively short time after the employee's complaint about discrimination. *Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir. 1992).

In light of Mr. Jackson's extensive disciplinary record, including his persistent violations of work and attendance rules both before and after his alleged reporting of racism, and the highly tenuous evidence of a causal connection between his complaint and his termination, a reasonable jury could not find that he was fired because of his complaining rather than his poor work performance.

III.

For the reasons stated, we affirm the district court's grant of Flint Ink's motion for summary judgment.

JOHN R. GIBSON, Circuit Judge, dissenting.

The court today acknowledges the teaching of the Supreme Court that "the burning of a cross is a symbol of hate," and "when a cross burning is used to intimidate, few if any messages are more powerful." Virginia v. Black, 123 S. Ct. 1536, 1546, 1547 (2003) (internal quotation marks omitted). It then, astoundingly, concludes that the burning cross graffiti, coupled with appellant's initials,[2] were not sufficient to create a fact issue for jury consideration.

I differ with the court's holding for two reasons.

First, the question of whether the note "H. J. slept here" is connected to the KKK and burning cross graffiti is a question of fact.[3] In reviewing a motion for

---

[2]Jackson testified that in his work area "they had the KKK sign with the cross and with my name under it." In discussing photos he had taken, he said that in a photo of the shower "they got the KKK sign plus the burning cross, and then they got my name on it." Gloria Lawler filed an affidavit stating, "Mr. Jackson asked me if I wanted to see the signs at Flint. He told me that the drawings were right on the outside for everyone to see. I walked across a field, and toward the overhead door. Right on the frame of the door was the drawing with KKK-HJ and the cross on it."

[3]Jackson described the "HJ slept here" and the KKK graffiti as part of the same photo and stated that he interpreted it as people "let[ting] me know, your ass gonna get burned up." Defense counsel stated that the name was "actually on the molding piece, it's not on the same portion of what the KKK is," and Jackson agreed. The copy of the photo reproduced in the appendix is not of sufficient quality for us to resolve any ambiguity, and on this record, it would not be proper to do so anyway.

summary judgment, we must view the facts in the light most favorable to the non-moving party, rather than choosing among various possible reasonable inferences. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (emphasis added); see also Kenney v. Swift Transp., Inc., 347 F.3d 1041, 1044 (8th Cir. 2003) (nonmovant entitled to all reasonable inferences). The court today discards two reasonable inferences--that the cross and the words were drawn by the same hand or else by different hands with the intent that the image and the words refer to each other. The court thus takes on the jury's job of choosing which among competing inferences is most likely.

Second, the court today distinguishes between a "crude drawing" of a burning cross and "a real live burning cross," supra at 7, to conclude that the writing on the wall was not intimidating enough to alter the terms and conditions of Jackson's employment. In Virginia v. Black, 123 S. Ct. at 1547, the Supreme Court observed that the burning cross, when used with intimidating purpose, is among the most powerful messages in our culture. The circumstances in this case support the inference that whoever drew the burning cross did it with intent to intimidate. This was obviously not, for instance, an educational or historical display for Black History month. The record is rife with evidence of hostility between Jackson and his white co-workers, including the spitting incident in which a co-worker referred to Jackson as a "fucking nigger." Jackson testified that he understood the message of the graffiti to be "scary." His co-worker Ronnie Davis testified that he believed the graffiti was a threat against Jackson because many of their co-workers didn't like Jackson. When a symbol threatening racial violence is invoked and continuously displayed in the plaintiff's workplace, it is both "frequent" and "physically threatening." See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The appearance of KKK graffiti in a workplace bathroom was not enough to create a hostile environment in Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 844 (8th Cir. 2002), but our holding

was based on the fact that the employer took prompt and decisive action to eradicate the graffiti. Here, the burning cross stayed on the wall. Jackson testified that it was in a very visible spot by the back door. Moreover, the propinquity of the burning cross to the written jab referring to Jackson by name supports the inference that the threat was directed at Jackson personally, a factor we held significant in creating a hostile environment in Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 909 (8th Cir. 2003).

I would hold that Jackson came forward with sufficient evidence of racial harassment to survive the motion for summary judgment.

---

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
THOMAS F. EAGLETON COURT HOUSE
ROOM 24.329
111 S. 10TH STREET
ST. LOUIS, MISSOURI 63102

MICHAEL E. GANS
Clerk of Court

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

September 10, 2004

Mr. Richard Sletten
Clerk
U.S. DISTRICT COURT, MINNESOTA
202 U.S. Courthouse
300 S. Fourth Street
Minneapolis, MN 55415

RECEIVED
BY U.S. MAIL
2004 SEP 13 AM 9:19
CLERK, U.S. DIST COURT
MINNEAPOLIS, MN

Re: 03-2189 Herman Jackson vs. Flint Ink

Dear Clerk:

The mandate of this Court is being sent to the clerk of the district court, together with a receipt. The clerk of the district court is requested to sign, date, and return the receipt to this office.

Any district court records in this court's possession will be returned shortly.

(5175-010199)

Sincerely,

Michael E. Gans

Michael E. Gans
Clerk of Court

srd

Enclosure

(LETTER FOR INFORMATIONAL PURPOSES ONLY)

---

cc: Honorable Paul A. Magnuson
Stephen M. Thompson
Edwin Lee Sisam
Dorothy J. Buhr
R. Scott Davies
Jason M. Hedican

District Court/Agency Case Number(s): CIV 01-2026 PAM/RLE